# WHEELING.

HINTON *et al. v.* MILBURN'S EX'RS *et al.*

Submitted January 18, 1883—Decided December 8, 1883.

(*SNYDER, JUDGE, Absent.)

1. In the construction of a will the intention of the testator is to be ascertained by taking the whole will together.   (p. 171.)

2. In giving a proper construction to a will the court will be aided in the interpretation of certain words and phrases used by keeping in mind the whole scheme of the will, and it should be so construed, if possible, as to make one consistent whole.   (p. 172.)

3. The manifest intention must have effect, unless some rule of law is violated thereby.   (p. 172.)

4. Technical words used must be construed to have their proper meaning, unless it appears from the will, that the testator used them in a different sense.   (p. 172.)

5. Taking the whole will together, it may appear, that by the word "heirs" the testator meant "children" or "issue."   (p. 172.)

6. A testator in the second clause of his will said : "I desire that my whole property, both real and personal, (my slave Torry excepted) be sold, and the proceeds of the same together with all debts owing to me after paying all my just debts be loaned and kept at interest till after the death of my slave Torry and the marrying or death of my daughter Rebecca Bryson or Rebecca Clark." In the third clause he said : "I desire that my slave Torry have a comfortable support out of my estate so long as she lives." In the fourth clause he said : "I desire that my daughter Rebecca Bryson, daughter of Rebecca Clark, after the death of my slave Torry, if she be married, receive the whole of my estate, but should she not be married, I desire that she receive from time to time so much of the same as she may need. for a comfortable support and education, to be judged of by my executors, till she marries, or so long as she lives. Should she die without heirs, any of my estate that may be left after supporting Torry, I desire to be equally divided between my brothers and sisters.  I do appoint James Harvey and Thomas Fowler to be executors of this my last will and testament, &c." The natural daughter a very few years after the death of the testator in 1836 married and had two daughters ; the mother and daughters both died many years before the old slave Torry, who

---

*Counsel below.

lived to be over one hundred years old, and died in 1862. HELD:

I. The estate was contingent upon Rebecca being *alive* and *married* at the death of the slave Torry, or marrying after the death of Torry.

II. That the word "heirs" used in the fourth clause of the will meant "children" or "issue of her body."

III. The natural daughter and her children being all dead at the time of Torry's death, the bequest at once vested in the brothers and sisters of the testator. (p. 173.)

7. The executors having discharged their duty under the will, and loaned the money with good security, which has not been lost and is still uncollected, they are discharged and no decree can be had against them. (p. 175.)

8. The principal and sureties in the bond to the executors are liable to the brothers and sisters of the testator. (p. 175.)

9. The bond having been executed in 1841, and a contract then entered into by the executors with the knowledge and consent of the sureties, that the principal should not be required to pay the money until the death of Torry, who died in 1862, and this suit having been brought in 1870, the sureties cannot rely on the presumption of payment, or on the statute of limitations. (p. 176.)

The facts of the case are stated in the opinion.

*Alexander F. Mathews* for appellants.

*J. D. Johnston, F. Hereford* and *A. N. Campbell* for appellees.

JOHNSON, PRESIDENT:

Nathan Milburn by his last will and testament made the following provisions:

"1st. I desire that after my death my body be buried in a respectable manner.

"2d. I desire that the whole of my property both real and personal (my slave Torry excepted) be sold, and the proceeds of the same together with all debts owing to me after paying all my just debts be loaned and kept at interest till after the death of my slave Torry, and the marrying or death of my daughter Rebecca Bryson or Rebecca Clark.

"3d. I desire that my slave Torry have a comfortable support out of my estate, so long as she lives, and the priv-

ilege of chosing a home to live at if the same may be deemed prudent by my executors.

"4th. I desire that my daughter Rebecca Bryson, daughter of Rebecca Clark, after the death of my slave Torry, if she be married, receive the whole of my estate, but should she not be married, I desire that she receive from time to time, so much of the same as she may need for a comfortable support and education, to be judged of by my executors, till she marries, or so long as she lives. Should she die without heirs any of my estate that may be left after supporting Torry I desire to be equally divided between my brothers and sisters. I do appoint James Harvey and Thomas Fowler to be the executors of this my last will and testament, hereby revoking all former wills. In testimony whereof I have hereunto set my hand and seal this 29th day of August, 1836."

The will was admitted to probate in the county court of Monroe county on the 19th day of September, 1836.

In 1840 Rebecca Bryson married Augustus Ball, and died in 1842 or 1843. She had two children, one of whom died in infancy, and the other married James Brammer, and died in 1857 or 1858, childless, having died in child-bed the child not being born. The slave Torry outlived them all and died in February, 1862, over one hundred years old.

Soon after Nathan Milburn's death the executors after paying the debts, collecting what was due to the estate and selling the real estate, had in their hands three thousand and seven dollars and nine cents which they loaned to the defendant, Augustus Ball, taking therefor his bond with security, dated February 12, 1841. This bond is still unpaid and represents the fund in controversy in this suit. The representatives of the brothers and sisters of the testator, filed their bill in the circuit court of Monroe county in 1870, to have said will construed, and have said fund paid to them under the provisions of said will. The defendants resisted this construction of the will, claiming that the said Rebecca Clark on her marriage with Augustus Ball had a vested remainder in the said fund, and therefore the provision for the testator's brothers and sisters was defeated. On the 19th day of May, 1880, the cause came on to be heard, and the court held, that "it appearing to the court that the said Rebecca men-

tioned in said will intermarried with the defendant Augustus Ball and afterwards died, leaving her said husband and lawful issue of said marriage living at her death, the court is of opinion and doth so adjudge, that the executory bequest over to the plaintiffs failed to take effect, and that they are not entitled to anything under said will;" and dismissed the plaintiffs' bill with costs.

From this decree the plaintiffs appealed. It is insisted in argument that the brothers and sisters of the testator took nothing under the will; that as soon as Rebecca Bryson married she had a vested remainder in the fund. On the other hand it is contended, that Rebecca only had a contingent interest in the estate, which contingency never happened, so that the estate never vested in her or her children, and that at the death of the slave, Torry, Rebecca and her children being all dead, the estate at once under the will went to the brothers and sisters of the testator.

All the authorities cited by the learned counsel for appellees present cases essentially different from the case before us.

In *Toothman* v. *Barrett*, 14 W. Va. 301, it appeared, that the testator gave to his son J. after the decease of his daughter E. all his lands to him *or* his heirs subject to the payment of four hundred and sixty-one dollars of legacies within five years after her decease, and in case J. shall die previous to the death of E., or fail to pay the legacies on account of inability on the part of J., in either case the land to be sold, and proceeds equally divided between certain other persons. It was held, that J. took a contingent remainder in fee in the lands of the testator, after the death of E. which was liable to be divested on his failure to discharge the four hundred and sixty-one dollars of legacies, and that the word "or" as used in the will could not be construed to mean "and."

In *Augustus* v. *Seabolt*, 3 Metc. (Ky.) 155, it appeared, that a testator bequeathed to his wife his farm "*during her natural life,*" also two slaves, (naming them) "during her natural life should she remain a widow," also "during her natural life" sundry articles of personal property naming them. The will then proceeds, "It is my desire, that in case my beloved wife *shall marry*, she is only to hold that part of the tract of

land and farm which is eastwardly of the lane and road lead-
ing through the plantation. After that event may take place
the balance of the devises made to her are not to be affected
by the circumstances of her intermarriage." The testator
then directs a sale of his personalty except that devised to
his wife, and if it be sufficient for the payment of his debts,
he bequeaths to her, "*during her natural life*" a negro man
·Aaron. "Item—I give and bequeath the real estate and slaves
herein devised to my beloved wife *during her natural life*, after
her death to be equally divided between the lawfully begot-
ten children of my brothers John, David, Jacob and James,
or such of them as may be living at the time of her death, or
the slaves and real estate to be sold and the proceeds to be
equally divided among said children *as aforesaid.*" There
was no residuary clause in the will. The widow married and
was alive at the time of the decision. It was held that the
heirs at law were entitled by descent to the land "lying
westwardly of the lane," as designated in the will, from the
period of the marriage of the widow of the testator until her
death, when the devisees in remainder under the devise to
them will be entitled. The court said as to the character of
the remainder :

" But it is said that the remainder interest of the devisee
was a vested one and took effect as completely upon the mar-
riage of the widow, as if she had died. This view is clearly
erroneous. The remainder is manifestly contingent in one
respect and cannot therefore be properly denominated a
vested remainder.

"Estates are contingent, which are limited to take effect,
upon the happening of an uncertain and doubtful event, or
where the persons, to whom they are limited, are not ascer-
tained, or yet in being. Fearne on Remainders, vol. 1 page
5; 3 Mon. 537, 18 B. Mon. 368.

"Here the estate in remainder is limited to take effect upon
the happening of a certain event, that is, the death of the
widow, but it is limited to such of the children of the
brothers designated, as shall be living at her death, whether
any of such class will then be alive or, if so, how many is
of course uncertain and cannot be known, until the event
occurs.

"The precise character of estate which the children take under the will, it is not now important to determine, further than to say that it is not a vested remainder taking effect upon the marriage of the widow, and thus excluding the heirs from their interest in the land in controversy during the period intervening between her marriage and death."

In *Jiggetts* v. *Davis*, 1 Leigh 420, Judge Carr says: "Personal property cannot be entailed. But if it be granted or bequeathed in such a manner, as that, if it were real estate, the grantee or devisee would take an estate tail, in such case the full and entire interest passes to the grantee or legatee, as it would have done, if the grant or bequest had been in the most absolute forms known to the law. Nor can there be in personal property, a remainer in the strict sense of the word, and therefore every future bequest of personal property, whether preceded or not by a prior bequest, or limited on a certain or uncertain event, is an executory devise or bequest and falls under the rules, by which that mode of limitations is regulated. Butler's Fearne 401. One of the most important of these rules is, that the contingency on which an executory devise or bequest is to take effect, must be such, that it must happen if at all within the compass of a life or lives in being and twenty-one years and some months thereafter. And it matters not whether a term or other personal property be limited to the first devisee or legatee, indefinitely, or for life expressly, or to him and his heirs, or the heirs of his body, or to his issue or children, for the limitation over, will be equally valid, under any of these circumstances, *provided the contingency on which the limitation over is to take effect, be restricted to the period aforesaid.*"

I quote this to show in the view we take of this will, that this rule of law is not violated.

It is true as claimed by counsel for appellees, that estates in remainder vest at the earliest possible period; but the rule is subject to the qualification, "unless there is a clear manifestation of the intention of the testator to the contrary." (*Doe* v. *Considine*, 6 Wall. 458; *Raney* v. *Heath*, 2 Patt. & H. 218; *Corbin* v. *Mills*, 19 Gratt. 438.) The intention is to be ascertained by taking the whole will together. In construing a will the court will be aided in the interpretation of

certain words or phrases used by keeping in mind the whole scheme of the will; and it should be so construed, if possible, as to make one consistent whole. The manifest intention of the testator must have effect, unless by giving it effect some rule of law is violated.

With these principles governing the construction of wills and with others announced by this Court in *Graham* v. *Graham, supra*, what was the intention of Nathan Milburn manifested by his will? The scheme of the will was evidently *first* to provide for the support and maintenance of his slave, Torry, and *second*, if his natural daughter Rebecca was living and married at the time of the death of Torry, she was to have the whole of his property, but if at that time she was living and unmarried, she was to have a comfortable support out of the interest arising from the fund, until she married, in which event she was then to have the whole of his property, or if she died without heirs, which clearly means children taking the whole will together (2 Jarman on Wills 86 and cases cited; *Dew* v. *Barnes*, 1 Jones Eq. 151), the third object of his will was to be accomplished by the bequest going to his brothers and sisters. Evidently he intended, that, if she married before the death of Torry and had children or heirs of her body, who should or any of whom should be living at the death of Torry, in which event the property was then to vest, it would go to such children; but the testator clearly intended, that, if at the time Torry died, Rebecca although she had been married and had had children, yet, if at the death of Torry, she was dead, and the heirs of her body were all dead, the estate should then vest in his brothers and sisters. This is the event that did take place, and the one it seems to us which was clearly provided for in the will.

After providing for converting the estate into money, he directs that it "*be loaned and kept at interest till after the death of my slave Torry and the marrying or death of my daughter Rebecca Bryson.*" Before the estate could vest in Rebecca, *two events* must happen: the death of Torry *and* the marriage of Rebecca. The two events are *conjunctively* united in the will. *They must* both *occur* and exist at the same time. She must have been married, and *must be living at the death of Torry*, or *after* the death of *Torry* become married, or the

estate under the will could not vest in her. It was therefore, *before* the death of Torry a *contingent* and not a *vested* interest, which she had in the estate, and if she was unmarried at the death of Torry still, her right to the estate was *contingent* upon her marriage. The estate under this will could not *rest* in any one until *the death* of *Torry.* The *two* events, both of which by the will were required to exist at the same time, to-wit, the *death of Torry and* the *marriage of Rebecca,* did not concur. That the testator intended to limit the right of Rebecca on the happening of *both* these events is rendered more clear by the language in the fourth clause of the will: "I desire that my daughter Rebecca Bryson *after the death* of my slave Torry, *if she be married,* receive the whole of my estate," &c., thus putting the two conjunctive events, the *death* of *Torry and* the *marriage* of Rebecca, in unequivocal language, and defining clearly the intent of the testator, that the estate was not to vest in Rebecca, until *both* said events had occurred. Rebecca having died in the lifetime of Torry and there being no children of hers in being at the death of *Torry,* when the estate was to vest, it then vested in the brothers and sisters under the will.

But it is said, the brothers and sister were not to take, unless Rebecca died "without heirs," and the fact is she left two children surviving her, when she died. The obvious answer is, that, as the estate did not vest and was not by the testator intended to vest in Rebecca, until the happening of the two events already considered, it is clear from the whole will, that the intent of the testator was, that if at the death of Torry Rebecca should be dead and no children of hers were *then* living, the brothers and sisters should take the estate, or if she married *after* the death of Torry and died without issue, the estate was then in that event to go to the brothers and sisters. The presumption is, that the testator intended to dispose of his whole estate, unless the contrary appears.

It is admitted by the parties to the suit, *first,* that after the debts of Nathan Milburn were paid his executors, Thos. Fowler and James Harvey, loaned the balance of his estate to Augustus Ball taking his bond with the persons named in the amended bill and the answer of Fowler, executor, as sure-

ties, and that said bond a copy of which is made an exhibit with the amended bill represents said fund; *second*, that at the time of the taking of said bond the sureties therein, James Byrnside, John Peters and Parkinson Shumate, were perfectly good pecuniarily each worth more than the amount of said bond and its interest; *third*, that said sureties continued good until after the death of said Thomas Fowler and James Harvey, and that their estates are still good and more than sufficient to pay said bond and interest; *fourth*, that Thomas Fowler died in April, 1858, leaving James Harvey surviving him, and that the slave Torry was still alive; *fifth*, that after the death of James Harvey John H. Vawter qualified as the representative of said Nathan Milburn, and that the said bond is still uncollected; *sixth*, that at the time of the death of James Harvey, the said Torry was still alive.

The amended bill sets up the fact of the selling the real and personal property of the testator by the executors, the paying of the debts, and the loaning of the money and exhibits the bond, which is as follows:

"We, or either of us, promise and oblige ourselves, our heirs, &c., to pay to Thomas Fowler and James Harvey, executors of Nathan Milburn, deceased, three thousand and seven dollars and nine cents, with interest from February 1, 1841, for value received. Witness our hands and seals, this 12th day of February, 1841.

$3,007.09. "AUGUSTUS BALL, [SEAL.]
"J. M. BYRNSIDE, [SEAL.]
"JOHN PETERS, [SEAL.]
"PARKISON SHUMATE. [SEAL.]"

To the original bill some of the heirs (not plaintiffs) of the brothers and sisters of Nathan Milburn were made defendants, and also the executors of James Harvey, who was one of the executors of Nathan Milburn, deceased, and also the executors of Thomas Fowler, the other executor of Nathan Milburn, deceased, and John H. Vawter, administrator *de bonis non*, with the will annexed of Nathan Milburn, deceased. To the amended bill, J. M. Byrnside, the executors of Parkison Shumate and the executors of John Peters were made defendants. Afterwards the death of J. M. Byrnside was suggested, and by consent of parties the suit was re-

vived against Lewis F. Clark, H. C. Brynside and H. S. Shanklin, executors of said J. M. Brynside, deceased. The executor of James Harvey, and the executors of Thomas Fowler, answered the bill, insisting that their testators had discharged their duty under the will by selling the estate and paying the debts and loaning the money and taking good solvent security. The executors of J. M. Brynside, also of John Peters, and also of Parkison Shumate, the sureties in the bond of Ball to the executors answered the bill and amended bill, in which they insisted that the plaintiffs took nothing under the will; that as soon as Rebecca married the estate vested in her, to come into possession after the death of Torry; but in this answer they do not suggest that in any way other than this their testators were relieved from the obligation of their bond. These same defendants also demurred to the bill, on the ground that if any demand existed against them by virtue of signing said bond, it was a legal demand and should be enforced in law and not in equity. The demurrer was overruled.

These same defendants afterwards filed another answer, in which they rely upon the statute of limitations. They deny that the executors of Nathan Milburn executed and delivered to said Ball and his sureties as a part of said contract a paper writing to the effect that said money should not be collected until the death of the slave Torry, provided the slave Torry was comfortably supported by said Ball and his sureties, &c. "They admit, that a contract was made by the said executors of Nathan Milburn with said Ball, that said money should not be collected until the death of said Torry, provided she was supported comfortably by said Ball, but said agreement was made without the assent or agreement of said sureties, and they are advised that by said contract they were released from all liability as such sureties," &c. To this answer there is a general replication.

Without deciding in this cause, on whom rests the burden of proof to show, that the said agreement with Ball was not made with the consent of the sureties, I am fully satisfied from the pleadings and proofs in the cause, that the said agreement by said executors of said Nathan Milburn not to collect said bond until the death of the slave Torry was made with the

knowledge and consent of the sureties. The agreement
was made on the same day the bond was executed, and
being in relation to the same subject-matter will be pre-
sumed to be a part of the same transaction, unless the con-
trary clearly appear. It appears from an exhibit filed with
the answer of James Harvey's executors, that to a suit at
law brought on said bond in the circuit court of Monroe
county, the defendants in that suit, the said Ball and his
sureties, pleaded the said contract, and in said plea insisted,
that the slave Torry was not dead, and that therefore the
money demanded was not due, &c. By the deposition of A.
Rick, which is not contradicted, the said sureties a short
time after they signed the bond agreed, that they would have
to support the slave Torry. Two of them said there was no
danger to them, "that the question would be settled in a few
months as Ball had married Rebecca Bryson, and she would
have a child soon, and the money would be his." There is
no evidence in the record tending to show, that the agree-
ment not to collect the bond, until after the death of Torry was
made without the consent of the sureties, but everything tends
to show, that they knew it and assented thereto.

This disposes of the question of the statute of limitations or
presumption of payment, which was insisted upon by coun-
sel for appellee.

There should be no decree against the estates of James
Harvey or Thomas Fowler, the executors of Nathan Milburn,
they having discharged their duty. But Augustus Ball, and
the estates of J. M. Byrnside, John Peters and Parkison
Shumate are liable to the representatives of the brothers and
sisters of the said Nathan Milburn, deceased; and a decree
should in the court below be rendered against the executors
of said estates to be paid out of the estates of their several
testators in their hands to be administered, the sum of three
thousand and seven dollars and nine cents with interest
thereon from February 1, 1841, until paid, subject to be
credited with the costs of supporting the slave Torry.
The demurrer to the bill was properly overruled. It was
necessary to resort to a court of equity to have the will con-
strued and the fund distributed.

The decree of the circuit court is reversed with costs; and

this cause is remanded to the circuit court with instructions to refer the same to a commissioner, to ascertain and report the balance due upon an account stated as above indicated and the several amounts due to the parties entitled to share in the distribution of said fund, and to be proceeded in to a final decree.

REVERSED.   REMANDED.